IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Edith E. Leach,                                :
                    Plaintiff                      Civil Action 2:10-cv-109
                                               :
       v.                                          Judge Watson
                                               :
Michael J. Astrue,                                 Magistrate Judge Abel
Commissioner of Social Security,     :
                    Defendant
                                               :

**REPORT AND RECOMMENDATION**

Plaintiff Edith E. Leach brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying her applications for Social Security Disability Insurance Benefits and Supplemental Security Income benefits.  This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.** Plaintiff Edith Leach maintains that she became disabled in August 2002, at age 45, by severe spondylosis, degenerative disc disease at L5-S1, loss of disc space and marked dessication and adjacent degenerative changes involving the inferior end plate of L4 and the superior end plate of L-5 with some narrowing of the right lateral recess and right-sided neuro-foraminal narrowing, and chronic back pain with left lower extremity radiculitis. The administrative law judge found that Leach retained the ability to perform a reduced range of jobs having sedentary exertional demands. Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge committed reversible error in refusing to give controlling weight or at least "great weight" to the opinions of the treating physicians, Drs. White and Richardson.

- The administrative law judge failed to present a complete hypothetical to the vocational expert.

- The vocational expert's testimony regarding what jobs claimant can perform is flawed are flawed.

**Procedural History.** Plaintiff Leach initially filed an application for Disability Insurance Benefits on February 21, 2003, and protectively filed an application for Supplemental Security Income on August 19, 2003, alleging that she became disabled on May 6, 2002, at age 45, due to paralysis of the right arm, liver disease, sciatica, the residuals of a lumbar fusion, and high serum cholesterol levels.  (R. 106-09, 780-83, 148.) The applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On June 21, 2005, an administrative law judge held a hearing at which plaintiff did not appear, but was represented by counsel.  (R. 791-809.)  On October 19, 2005, the administrative law judge issued a decision finding that Leach was not disabled within the meaning of the Act.  (R. 38-48.) On December 20, 2006, the Appeals Council vacated the prior decision and remanded the case due to the receipt of new and material evidence.  (R. 76-77.)

During that time, Leach filed applications for Disability Insurance Benefits and Supplement Security Income on March 22, 2006.  (R. 15, 129-31.)  The Commissioner consolidated these applications with Leach's prior applications.

2

On May 15, 2007, a second hearing before an administrative law judge was held.  On August 23, 2007, the administrative law judge issued a decision finding that Leach was not disabled within the meaning of the Act.  (R. 15-23.)  On December 9, 2009, the Appeals Council denied Leach's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 7-9.)

**Age, Education, and Work Experience.**  Plaintiff Leach was born August 28, 1957.  (R. 129.)  She graduated from high school, then earned a certificate as a nurses assistant.  (R. 154, 815.)  She has worked primarily as a customer service representative, receptionist, job coach, and a sales clerk.  (R. 162-65, 204.)

**Plaintiff's Testimony.**  The administrative law judge fairly summarized Leach's testimony at the administrative hearing as follows:

> At the hearing, the claimant testified that she graduated from high school.  She denied any problems with literacy.  She had a driver's license and drove with no problems.  Her husband drove her to the hearing.
>
> She further testified that she last worked on May 6, 2002; she was working as a customer service representative at the time.  She stopped working due to back fusion surgery.  She had undergone a spinal fusion in May 2002 but did not receive any relief from the surgery.  She stated that she was no longer able to work due to chronic back pain with radiation to her right leg: she had a morphine pump for pain.  She also suffered residual problems from a right ankle fracture in August 2006.
>
> With respect to her physical abilities, she reported that she could lift about twelve pounds.  She could walk or stand for between thirty minutes and an hour without interruption.  She had to

3

alternate positions when she sat.

The claimant reported that she lived in a mobile home.  She was independent in self-care activities.  She did some household chores, such as cooking, washing dishes; and laundry.  She had to sit on a stool to wash dishes.  Her washer and dryer sat on a pedestal so that she did not have to lift.  She had friends with whom she socialized on weekends.  She enjoyed doing crafts and going camping.

(R. 16.)

**Medical Evidence of Record.**

Surgical history. Leach has a history of a gunshot wound in 1974.  (R. 235 -36, 245, 247.)  In 1971, she underwent a laminectomy after falling down a flight of stairs.  (R. 247.)  In 1987, she fell at work and developed back pain with numbness and tingling into her left thigh.  (R. 247.) In 1993, Leach underwent another laminectomy and diskectomy due to perineural scarring. (R. 247-49, 253 and 390.) In August 2002, Leach had a bilateral fusion at L4-L5 with decompression laminectomy. (R. 274-96.)

Neuro/Surgical Associates: Robert Dixon, D.O./Mark White, D.O. Dr. Dixon performed the 1993 laminectomy and diskectomy on Leach due to perineural scarring. On May 24, 2002, Dr. Dixon, examined Leach for recurrent left lower extremity radicular pain.  On neurological examination, Leach was unable to heel walk due to claims of pain and weakness in her left foot, straight leg raise testing was positive on the left, her strength and reflexes were normal, her gait was antalgic (a limp adopted to avoid pain), and her forward flexion was limited.  Dr. Dixon assessed Leach with

radiculitis of the left leg due to unknown etiology, and post-laminectomy syndrome.
Dr. Dixon recommended against physical therapy due to the severity of Leach's
symptoms and suggested lumbar epidural steroid injections.  (R. 379-84.)

On June 8, 2002, Dr. White, an associate of Dr. Dixon, administered a lumbar
epidural steroid injection.  (R. 375-76.)  On follow-up in July 2002, Leach reported
continued severe back pain and radicular symptoms in her left leg.  (R. 373.)  On July 12,
2002, Leach underwent a diskography of L3-4, L4-5, and L5-S1. (R. 267-73, 373.)  The
diskography was normal at L3-4, showed a degenerative pattern at L4-5 with deformi-
ties at L4 and metallic foreign bodies, and a possible small annular tear at L5-S1.  (R.
270.)  Dr. White, performed a bilateral fusion L4-5 with decompression laminectomy in
August 2002.  (R. 274-96.)

 In September 2002, Leach told Dr. White that she was doing well.  She reported
that she still had back pain but that it was controlled with her medications.  On
examination, Leach's strength was normal throughout and she had no sensory deficits.
Dr. White reported that Leach was doing well.  (R. 370.)  In October 2002, Dr. White
noted that x-rays of Leach's fusion showed that it was well-positioned.  Leach reported
that her left leg pain had completely resolved and that her back pain was reduced by
50%.  (R. 369.)  On November 2, 2002, Dr. White indicated that he was unable to
complete a work capability evaluation stating that such "evaluations are outside the
scope of my practice." (R. 368.)  On November 8, 2002, Leach told Dr. White that she
continued to have severe back pain along with some numbness and tingling in her right

calf.  On examination, her strength was normal and she had no sensory deficits.  X-rays showed good alignment of her fusion.  Dr. White recommended that Leach start physical therapy and indicated that further surgery was not recommended.  (R. 366-67.)  In December 2002, Leach told Dr. White that she was unable to work or do any activity secondary to prolonged sitting and standing exacerbating her back pain.  (R. 365.)

In January 2003, Dr. White noted that Leach had made progress with her symptoms until she fell off her deck onto her back at the end of December 2002.  (R. 363.)  In February 2003, Leach reported no significant relief of her back pain.  Dr. White noted that Leach's examination was unremarkable without any deficits and that x-rays showed a good fusion.  Dr. White indicated that Leach had reached maximum medical improvement and referred her to a pain management doctor.  (R. 361-62.)

On January 2, 2004, Leach was re-evaluated by Dr. White for complaints of continued back and leg pain with numbness and tingling.  On examination, Leach exhibited no focal deficits.  X-rays showed no evidence of instability in her fusion.  Dr. White concluded that

> there is nothing  from a neurosurgical standpoint further to offer her. I feel she has reached maximal medical improvement from my standpoint and she most likely will be unable to perform any type of work, even sedentary at this time.

(R. 445.) He suggested either a spinal cord stimulator or a pain pump. *Id.*

On June 10, 2004, Leach saw Dr. White "to obtain a letter stating that she is completely disabled and is unable to perform any type of sedentary work." (R. 443.) She told Dr. White that she was unable to sit for more than 10-15 minutes at a time or stand

6

for prolonged periods, and was unable to perform any type of work.  Dr. White noted that Leach's physical examination was unchanged.  Dr. White's diagnostic impression was that Leach had failed back syndrome, peridural fibrosis, and an inability to stand or sit for more than ten minutes at a time. *Id*.

Stephen Richardson, M.D.  The record contains treatments notes from Leach's primary care physician, Dr. Richardson from August 3, 2001 through December 29, 2006.  (R 332-58, 477-501, 625-36, 748-51.)  On May 6, 2002, Leach saw Dr. Richardson, after being seen in the emergency room, for complaints of back pain with radiation and numbness down her left leg after doing yard work the previous day.  (R. 259-60, 354-55.)  An x-ray of her lower back showed post-surgical changes and degenerative disc disease at L4-5.  (R. 325.)  On May 13, 2002, an MRI of the lumbosacral spine demonstrated degenerative or post-surgical changes, and a small right sided disc protrusion at L4-5 without central canal stenosis.  (R. 320-21.)

On January 12, 2004, Leach saw Dr. Richardson regarding disability paperwork. Dr. Richardson noted that Leach suffered from sleeping problems, frequent headaches, blurred vision, loud snoring, frequent sore throats, swollen glands, abdominal pain, heartburn, frequent vomiting, pain in back, stiffness in joints, swelling of joints, and that she easily bruises.  (r. 489.) On physical examination, palpation and range of motion were normal throughout the spine. A neuromuscular examination was normal. There was normal curvature of the lumbar spine. There was mild tenderness at the midline from L2 through L5. There was also diffuse moderate tenderness off the midline but no

7

tenderness in the paraspinous muscles. Dr. Richardson diagnosed "other and unspecified back disorders" and "low back syndrome." (R. 490.) He noted that Leach's condition was unstable or worsening and opined that she had "no appreciable chance of obtaining or maintaining gainful employment." *Id.*

In January 2004, Dr. Richardson responded to a Social Security questionnaire that Leach suffered from failed back syndrome. He reported that Leach required position changes every forty five or sixty minutes. She was unable to bend without pain. She exhibited gait disturbance, pain and tenderness on palpation, loss of sensation. (R. 491.) Leach reported to Dr. Richardson that some days she need to use a cane to walk. He estimated that Leach would be absent from work more than three times per month because of her pain and that her pain would constantly interfere with her concentration and attention. (R. 492.) Dr. Richardson said that Leach could never lift any weight; could sit, stand, and walk less than 1 hour in an 8-hour workday; could never bend, squat, crawl, or climb or reach above shoulder level. (R. 493-94.)

On October 18, 2006, Dr. Richardson reported that Leach's conditions included high cholesterol, leukocytosis, chronic venous hypertension, constipation, ankle pain, low back syndrome, and lumbosacral spondylosis. Dr. Richardson noted that standing, walking, sitting, and carrying are all affected by Leach's condition. Dr. Richardson reported that Leach could lift up to five pounds frequently and occasionally. Dr. Richardson noted that Leach is extremely limited in pushing, pulling, balancing, reaching, handling, and repetitive foot movements. (R. 678-80.)

8

During a December 2006 physical before surgery to instal a pain pump, Leach's gait and station were normal, and motor, sensation, and reflex testing were normal.  (R. 749-50.)

On January 17, 2007, Dr. Richardson completed a chronic pain residual functional capacity questionnaire.  (R. 743-47.) Dr. Richardson's diagnoses were lumbosacral spondylosis without myelopathy, radiculitis, lumbosacral neuritis, and chronic back pain.  (R. 747.) Plaintiff complained of chronic low back pain., sharp and aching. She reported almost daily, constant pain. She had severe pain with sudden movement, lifting and climbing. Dr. Richardson said that Leach's pain complaints were supported by reduced range of motion, positive straight leg raising, tenderness, reflex changes, impaired sleep, abnormal posture, muscle spasm, muscle weakness, and abnormal gait. (R. 743.) Dr. Richardson said that Leach could sit for one hour; stand for 30 minutes; and sit, stand, or walk for only a total of less than two hours in an eight-hour day.  Dr. Richardson reported that Leach would need a sit/stand option and would need to lie down eight times during a work shift, and that she would need to elevate her legs for 10 hours.  Dr. Richardson further opined that Leach was unable to lift any weight, needed a cane, and would miss work more than three times a month.  (R. 744-46.)

Michael Orzo, M.D.   From March 2003 to May 2006, Dr. Orzo, a chronic pain specialist, treated Leach.  (R. 414-33, 446-70, 517-46, 637-97.)  Treatment noted indicate that Leach was treated with various narcotic pain medications, epidural injections, and radio frequency spinal nerve ablation, all without success in improving her pain

9

complaints. Dr. Orzo assessed post-laminectomy syndrome.

In January 2005, Dr. Orzo implanted a lumbar spinal cord stimulator. (R. 649-50.) EMG testing of her low back and leg performed in December 2005, showed sensory deficits in the L5 and S1 dermatomes, but no evidence of acute or ongoing motor axon loss. It was recommended that Leach begin a leg conditioning, muscle toning, and balance program with a physical therapist. (R. 598-600.)

Don Long, M.D. In June 2003, Dr. Long, a specialist in physical medicine and rehabilitation, examined Leach for the Bureau of Disability Determination. Leach reported a long history of back pain since falling down metal stairs at age 18. On examination, she had normal strength in both legs and her left arm, but claimed zero strength in her right arm; she walked normally; and her lumbar range of motion was limited. Dr. Long noted that although Leach refused to move her right arm, when she became distracted talking to staff, there were no muscle contractions and movement in her right arm. Dr. Long assessed Leach with status post decompressive laminectomy, chronic low back pain and a conversion type disorder relating to her right arm. Dr. Long opined that Leach was capable of performing a range of medium work. (R. 396-406.)

Anton Freihofner, M.D. /W. Jerry McCloud, M.D. On June 25, 2003, Dr. Freihofner, reviewed the medical record for the Commissioner and completed a Physical Residual Functional Capacity Assessment. Dr. Freihofner concluded that Leach could occasionally lift twenty pounds, frequently lift ten pounds, stand, walk

and/or sit for a total of about six hours in an eight hour workday.  Her ability to push or pull is limited in the lower extremities because of the four procedures to the L4-5 disc space.  Leach could kneel and crawl occasionally.  She had no manipulative, communicative, or visual limitations.  (R. 409-13.)  In September 2003, Dr. Jerry McCloud, affirmed Dr. Freihofner's assessment.  (R. 413.)

Robert Cooper, M.D.  In November 2004, Dr. Cooper performed a disability examination and evaluation of Leach underwent for the Ohio Bureau of Disability Determination. During the examination, Leach exhibited a normal gait and ability to walk. She could rise from a seated position without difficulty; and she was able to do a heel to toe walk. She was able to stand independently on each leg and do a deep knee bend without losing her balance. She got on the examination table without difficulty. (R. 504.) Sensory, motor and reflex examinations were within normal limits. Range of motion was normal, although limited in the lumbar spine by her previous surgeries. There was wasting of the paraspinous muscles. (R. 505-509.) Dr. Cooper diagnosed Leach with failed back syndrome and opined that she retained the capacity to occasionally lift ten pounds, frequently lift twenty pounds, could stand or walk at least two hours in an eight hour workday, and could sit about six hours in an eight hour workday.  (R. 505, 510-11.)

Jill Mushkat, Ph.D.  In October 2005, Leach underwent an evaluation with Dr. Mushkat, a clinical psychologist, for evaluation prior to being considered for the implantation of a morphine pump.  Based on her evaluation of Leach, Dr Mushkat

11

reported that there were a number of concerns that did not bode well for successful use of a morphine pump: trial use of a spinal cord stimulator had been unsuccessful, her inconsistent statements regarding whether she wanted to return to work, her "focus[] on obtaining disability. . . ." (R. 593.) Dr. Mushkat also noted a "component of reinforce-ment for an illness lifestyle that is likely to be extremely resistant to change." (R. 594.)

Gladstone McDowell II, M.D.  In October 2006, Leach saw Dr. McDowell, another chronic pain specialist for a second opinion regarding the use of a morphine pump.  (R. 740-42.)  Dr. McDowell concluded that a morphine pump would be appro-priate, and performed the procedure in January 2007.  (R. 768-69.)  When seen in Feb-ruary 2007 for follow-up, she was noted to be doing well.  (R. 767.)  In March 2007, Dr. McDowell increased her dosage of Hydromorphone.  (R. 766.)

**Medical Expert Testimony.**  Dr. Richard Hutson, an orthopedic surgeon, testi-fied as the medical expert at both the June 2005 hearing and the May 2007 hearing.  (R. 794-806, 820-22.)  At the June 2005 hearing, Dr. Hutson testified that Dr. Richardson's January 2004 assessment was not supported by the record evidence.  (R. 800-01).

At the May 2007 hearing, Dr. Hutson testified that Leach's back impairment did not meet or medically equal the requirements of Listing 1.04.  Dr. Hutson opined that Leach retained the residual functional capacity for sedentary work with a sit/stand option five minutes of every hour; no climbing of ladders, ropes, or scaffolds, but able to otherwise occasionally engage in postural activities; and no concentrated exposure to cold, heat, wetness, humidity, vibrations, or hazards.  (R. 820-21.)

12

**Vocational Expert Testimony.**  The vocational expert present at the May 2007 hearing was asked to assume an individual with Plaintiff's age, education, and work experience who could do sedentary work with the option to sit/stand at will, with no environmental hazards.  The vocational expert testified that this person could perform her past work as a customer service representative.  The vocational expert also testified that the individual could perform other jobs in the region including 150 jobs as a surveillance system monitor, 500 jobs as an addresser, and 200 jobs as a preparer of microfilm.  She verified that all of these jobs would allow a worker to sit or stand as needed. The vocational expert testified that the description provided by Leach of her former employment with CIGNA Health Insurance fit the description of a data entry specialist, which she classified as sedentary and semi-skilled.  (R. 830-43).

**Administrative Law Judge's Findings.**

The administrative law judge discussed the medical evidence:

> It is the consensus of treating and examining sources that the claimant has some functional restrictions which affect her ability to work. The claimant's "severe" impairments result in chronic low back pain, reduced spinal mobility, and impaired ambulation. Having carefully considered the objective medical evidence and clinical findings of record, I adopt the expert medical opinion provided by Dr. Hutson and find that the claimant retains the functional capacity to perform sedentary work. . . . Giving the claimant the full benefit of doubt with regard to her allegations and subjective complaints, I find that she is limited to jobs that would afford her the opportunity to alternate between sitting and standing as required for comfort. She is further limited to jobs that can be performed in a temperature-controlled environment. She should not be expected to perform work that would involve exposure to industrial hazards.

(R. 19.) The administrative law judge rejected the opinions of treating Drs. White and

13

Richardson that Leach was unable to perform even sedentary work because "neither opinion is supported by the objective medical evidence of record, but they appear to be based on an uncritical acceptance of the claimant's subjective complaints." (R. 20.) The administrative law judge found that Leach's daily activities were consistent with sedentary work:

> The claimant's impairments do not significantly restrict her activities of daily living. She was independent in self-care activities. She did some household chores, such as cooking, washing dishes, and laundry. She enjoyed doing crafts and camping. She had a driver's license and was able to drive without restriction.
>
> An examining source noted that the claimant was "focused on obtaining disability." It was further noted that she cultivated an "illness lifestyle" (exhibit 34F, pages 2-3).
>
> When questioned by the Medical Expert, the claimant acknowledged a significant improvement in her pain level with the use of a morphine pump. I note the use of a morphine pump is not *ipso facto* evidence of disability. Rather, the use of such equipment is to help the patient be able to do more. In view of her testimony that she is able to go camping, it is obviously succeeding in this case.

(R. 20-21.) The administrative law judge summarized his findings as follows:

1. The claimant alleges disability since February 21, 2003. She met the disability insured-status requirements of the Act on February 21, 2003, the date the claimant stated that she became unable to work and continues to meet them though December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since, February 21, 2003.

3. The medical evidence establishes that the claimant has "severe" impairments of degenerative disk disease of the lumbar spine with residuals of surgery, chronic lumbar radiculopathy, and post-laminectomy syndrome. Those impairments may affect her ability to perform some basic work-related functions. The severity of the claimant's impairments does not meet or equal

the level of severity described in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant is capable of performing the basic exertional requirements of sedentary work, as such work is defined for Social Security purposes (20 CFR 404.1567 and 416.967).  However, she is limited to jobs that would afford her the opportunity to alternate between sitting and standing as required for comfort.  She is further limited to jobs that can be performed in a tempera-ture-controlled environment.  She should not be expected to perform work that would involve exposure to industrial hazards.

5. The claimant's allegations and subjective complaints are generally credible except for the underlying inference that she is disabled from all work activity (20 CFR 404.1529 and 416.929).

6. The claimant's residual functional capacity for the full range of sedentary work is reduced by the limitations addressed in Finding No. 4.

7. The claimant's past relevant work as a customer service clerk did not require the performance of work-re1ated activities precluded by the above limitations (20 CFR 404.1565 and 416.965).

8. The claimant's impairments do not prevent her from performing her past relevant work as a customer service clerk.

9. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404. 1520(f) and 416.920(f)).

(R. 21-22.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" *Id.  LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.

15

1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must '"take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge committed reversible error in refusing to give controlling weight or at least "great weight" to the opinions of the treating doctor. Plaintiff asserts that Drs. White and Richardson's opinions should be given controlling weight. Plaintiff contends that not only did the administrative law judge fall short of recognizing the applicability of the 20 C.F.R. §404.1527(d)(2) guidelines, he failed to provide supported explanation as to why the reports and conclusions of the treating physicians, Drs. White and Richardson, coupled with the testimony of the Plaintiff, were not adopted or granted deference or at least any credibility with regard to the severity of Plaintiff's impairments.

16

- **The administrative law judge failed to present a complete hypothetical to the vocational expert.**  Leach argues that the hypothetical that the administrative law judge created and posed to the vocational expert fails to accurately describe Leach's abilities in several respects, including the inability to effectively ambulate, if she were absent from work for three days or more a month due to her impairments and treatment; and elevation requirement her lower extremities, especially her right ankle.

- **The vocational expert's testimony regarding what jobs Leach can perform is flawed.**  The vocational expert stated that Leach could perform her past relevant work as a customer service clerk which was described as skilled work, but she failed to cite to the *Dictionary of Occupational Titles* (DOT).  Leach argues that none of the customer service positions listed in the DOT have a description that matches the job she performed.  Leach also contends that the vocational expert testified that Leach could perform the job of a surveillance systems monitor, however, this job does not exist in a significant number in the economy.  Even the vocational expert testified that there were only 150 in the region, which is not a significant number, according to Leach.

Treating Physician:  Controlling Law. In assessing the medical evidence support-ing a claim for disability benefits, the administrative law judge must adhere to certain

standards. *Blakley v. Commissioner of Social Security*, 581 F.3d 399 (6th Cir. 2009). One such standard, known as the treating physician rule, requires the administrative law judge to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone of from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Id.*, *quoting*, *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544, *quoting*, 20 C.F.R. § 404.1527(d)(2).

A treating doctor's opinion on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record. *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983). The treating doctor has had the opportunity to observe his patient's impairments over the course of time.

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. § 423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commiss-

ioner when it is not supported by detailed clinical and diagnostic test evidence. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527.

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1).  When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2).  In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision.  *Id.*  Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled.  20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given

to a treating source's medical opinion unless the opinion is well-supported by med-
ically acceptable clinical and laboratory diagnostic techniques." Consequently, the
decision-maker must have "an understanding of the clinical signs and laboratory
findings and what they signify." *Id.* When the treating source's opinion "is well
supported and not inconsistent with the other substantial evidence in the case record, it
must be given controlling weight . . . ." The Commissioner's regulations further
provide that the longer a doctor has treated the claimant, the greater weight the
Commissioner will give his or her medical opinion. When the doctor has treated the
claimant long enough "to have obtained a longitudinal picture of your impairment, we
will give the source's [opinion] more weight than we would give it if it were from a
non-treating source." 20 C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating
sources' medical opinions. Social Security Ruling 96-2p. It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without
   some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances
   to medical opinions, *i.e.*, opinions on the issue(s) of the nature and
   severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical
   opinion unless the opinion is well-supported by medically acceptable
   clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling
   weight may not be given to the opinion unless it also is "not inconsistent"
   with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well supported

20

and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7.  A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

The case law is consistent with the principals set out in Social Security Ruling 96-2p.  A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).   The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).  The Commissioner must make the final decision on the ultimate issue of disability.  *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Physician:  Analysis.

21

Plaintiff's first assignment of error finds fault with the administrative law judge for not giving controlling weight to the opinion of her treating physicians, Drs. White and Richardson.  In *Rogers v. Commissioner of Social Security.*, 486 F.3d 234, 253 (6th Cir. 2007),  the Court noted, if a treating physician expresses an opinion that a claimant has conditions which are sufficiently severe to preclude work-related activity, if those opinions are adequately supported, and if there is no medical evidence to the contrary, the opinion will be controlling.  On the other hand, when this is not the case, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242.  From a procedural point of view, when the Commissioner does discount the opinion of a treating physician, the Commissioner must identify with specificity "the reasons for discounting the opinions" and must explain "precisely how those reasons affected the weight accorded to the opinions...." *Id.*

The administrative law judge determined that Leach retains the functional capacity to perform sedentary work.  (R. 19.)  Sedentary work involves lifting no more than ten pounds frequently, and walking or standing for no more than a total of two hours in a normal workday.  (20 CFR §§ 404.1567 and 416.967).  The administrative law judge found that Leach "is limited to jobs that would afford her the opportunity to alternate between sitting and standing as required for comfort.  She is further limited to

22

jobs that can be performed in a temperature-controlled environment.  She should not be expected to perform work that would involve exposure to industrial hazards."  (R. 19.)

The administrative law judge rejected the opinions of Drs. White and Richardson, Leach's treating physicians, finding,

> Drs White and Richardson both concluded that the claimant would be unable to perform even sedentary work.  However, neither opinion is supported by the objective medical evidence of record, but they appear to be based on an uncritical acceptance of the claimant's subjective complaints.  As such, neither opinion can be accepted.

(R.  19-20.)

This assessment by the administrative law judge is supported by the record. Dr. Long, a specialist in physical medicine and rehabilitation, examined Leach in June 2003 and found that she was capable of performing medium work. (R. 396-406.) In November 2004, Dr. Cooper examined Leach and found that she could perform sedentary work. (R. 505 and 510-11.) Dr. Hutson, an orthopedic surgeon, testified that Leach could perform sedentary work. (R. 820-21.) Findings on clinical examination by Drs. White and Richardson were modest. Dr. White, her surgeon, merely said that there was nothing  surgical he could do for Leach. Her spinal fusion was stable. There were no focal deficits, but Leach complained that her pain was not diminished by the surgery. (R. 443 and 445.) On examination, Dr. Richardson found palpation and range of motion to be normal. There was mild to moderate muscle tenderness throughout the lumbar spine. (R. 490.) Motor, sensation and reflex testing were normal. (R. 749-50.) On this record, the administrative law judge was not required to accept the opinions of Drs.

White and Richardson on the issue of disability.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner denying benefits be **AFFIRMED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


                                        s/Mark R. Abel_____
                                        United States Magistrate Judge